UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>BENJAMIN LYLE IVERSON,<br><br>Defendant. | 4:15-CR-40075-LLP<br><br>REPORT AND RECOMMENDATION |

## INTRODUCTION

Defendant Benjamin Lyle Iverson is before the court on an indictment
charging him with attempted commercial sex trafficking in violation of 18
U.S.C. §§ 1591 and 1594(a).  Mr. Iverson now moves to suppress certain
evidence.  See Docket No. 20.  The government resists the motion.  See Docket
No. 24.  This motion was referred to this magistrate judge to hold an
evidentiary hearing and to recommend a disposition pursuant to 28 U.S.C.
§ 636(b)(1)(B) and the October 16, 2014 standing order of the Honorable Karen
E. Schreier, District Judge.  The following is this court's recommended
disposition.

## FACTS

An evidentiary hearing was held in this matter on Friday, July 24, 2015.
Mr. Iverson was present in person at the hearing along with his lawyer,
Assistant Federal Public Defender Jason Tupman.  Representing the

government was Assistant United States Attorney Jeffrey Clapper.  At the hearing, two witnesses testified and one exhibit was received.  From this evidence, the court makes the following findings of fact.

In April, the Internet Crimes Against Children (ICAC) task force was conducting an undercover sting operation on the internet in Sioux Falls, South Dakota.  This involved law enforcement officers posing on the internet as underage girls or pimps offering underage girls for sex.  When a person responded and indicated they wished to arrange sex with an underage girl, a meeting place would be arranged.  Law enforcement officers would then conduct surveillance at the arranged meeting place and intercept the suspect.

The government alleges that on April 11, 2015, Mr. Iverson responded to such a sting operation.  In chats with law enforcement, Mr. Iverson allegedly indicated he was a male and was located at a laundromat near the intersection of 18th Street and Marion Road in Sioux Falls, South Dakota.  Arrangements were made for Mr. Iverson to meet the underage girl at a gas station or a park nearby.  Agents Troy Boone and Jessica Page, members of the ICAC task force, were together in an unmarked car and they took up a surveillance position between the gas station and the laundromat.  Special Agent Dave Keith, also a member of ICAC, took up a surveillance position at the park in an unmarked vehicle.

Mr. Iverson was observed walking from the laundromat to the gas station.  He then crossed Marion Road and began walking south in a path that took him past the entry to the aforementioned park.  He continued walking

2

south on Marion Road from 18th Street to 37th Street with Agents Boone and Page covertly following him. When he reached 37th Street, Mr. Iverson left Marion Road and began walking east on 37th. In the chats, Mr. Iverson had indicated he lived near a restaurant located nearby. Agent Boone surmised that Mr. Iverson was on a path to his home. The agents felt the time had arrived when they should stop Mr. Iverson and make contact with him.

Agents Boone and Page turned off of Marion onto 38th Street and continued covertly following Mr. Iverson, watching his progress in the interstices between houses. Agent Boone then turned north, traveled one block, and then turned west on 37th Street, heading toward Mr. Iverson. He pulled over to the curb, parked, exited his vehicle and walked toward Mr. Iverson. Agent Page stayed at the vehicle standing next to the passenger side with the passenger door open about 20 feet away from Agent Boone and Mr. Iverson.

Agent Boone contacted the other officers who had been conducting surveillance around the intersection of 18th Street and Marion Road to let them know he was making contact with the suspect. Agent Keith then traveled from the park to Agent Boone's location, arriving shortly after Agent Boone made contact with Mr. Iverson.[1] When Agent Keith arrived, he stationed

---

[1] Agent Boone was unable to pinpoint the time when Agent Keith joined he and Agent Page. However, Agent Keith testified when he arrived, Agent Boone was still driving on 38th Street and Agent Keith observed Agent Boone turn north and then west on 37th Street. When Agent Keith parked his vehicle right behind Agent Boone's vehicle, both Agent Boone and Agent Page were out of their vehicle and Agent Boone was talking to Mr. Iverson. Thus, the court finds

himself approximately 10 feet from Agent Boone and Mr. Iverson—close enough to hear the conversation, but not part of the conversation.

As Agent Boone approached Mr. Iverson, he displayed his badge identifying him as a law enforcement officer and asked Mr. Iverson if he could talk to him. Mr. Iverson said "sure." Agent Boone did ***not*** tell Mr. Iverson that the talk was voluntary, that he did not have to talk to him, that he was not under arrest, or that he was free to leave. At this point, Agent Boone testified that Mr. Iverson looked nervous and was looking around as if getting ready to bolt. Agent Boone was dressed in street clothes consisting of jeans, a polo shirt and a light jacket. He was armed with a handgun, but his weapon was concealed by his clothing. Agents Page and Keith were also dressed in casual street clothing.

Agent Boone falsely told Mr. Iverson he was investigating a burglary. Upon hearing this, Agent Boone testified Mr. Iverson visibly relaxed, taking a deep breath. Mr. Iverson told Agent Boone he had not committed a burglary, he was just coming home from work. Agent Boone asked if he could see Mr. Iverson's cell phone to see if the data on the phone indicated Mr. Iverson's location during the burglary. Mr. Iverson told Agent Boone he did not have a cell phone.

Agent Boone then asked Mr. Iverson for identification and Mr. Iverson handed him a South Dakota identification card. Agent Boone noted the

---

that Agent Keith arrived at the scene very shortly after Agent Boone first made contact with Mr. Iverson.

address on the ID card matched the address the suspect had given to the undercover officer in the online chat.

Agent Boone again asked Mr. Iverson for his cell phone, telling him it would be an easy way to eliminate him as a suspect in the burglary. Mr. Iverson responded he did have a cell phone, but the battery was dead. Agent Boone offered to charge his phone for him. Mr. Iverson responded he knew his rights and knew he did not have to give the agent his phone. He added that even if Agent Boone charged the phone, Mr. Iverson would not allow Agent Boone to see it. During this entire exchange, Agent Boone was standing approximately three to five feet away from Mr. Iverson.

Agent Boone then told Mr. Iverson the real reason he was talking to Mr. Iverson, that he was investigating an underage commercial sex transaction. Mr. Iverson began backing away from Agent Boone. Agent Boone testified Mr. Iverson again looked nervous, took a deep breath, and began displaying a facial tic. Agent Boone stepped toward Mr. Iverson an equal distance. Thereafter, Mr. Iverson made a number of statements relative to the alleged crime. Mr. Iverson began looking around again as if getting ready to run. At this point, Agent Boone handcuffed Mr. Iverson.

Agent Boone asked more questions after he handcuffed Mr. Iverson. He admonished Mr. Iverson to be honest, told Mr. Iverson this was a "serious matter," and then talked to him about the substance of the suspected offense. Mr. Iverson told Agent Boone he was just investigating so that he could turn

over the perpetrator to the police. Agent Boone responded "you should have just called 911." Mr. Iverson replied, "I know."

Agent Boone then stepped away to make contact with other officers at his vehicle to let them know he had the suspect in custody, that the suspect had admitted he was the same person as in the chat, and the other officers could discontinue their surveillance. At this point, Agent Boone asked Agent Keith to watch Mr. Iverson for him. Agent Keith then stepped closer to Mr. Iverson, to within three to five feet of him. Agent Boone was still in possession of Mr. Iverson's identification card at this time.[2]

Agent Keith made small talk with Mr. Iverson about a pick-up truck. Then, without any question being asked by Agent Keith, Mr. Iverson stated words to the effect that he had not done anything to that [underage] girl and that he had responded to the chat in an effort to help police catch bad guys. Agent Keith responded "So, you're setting yourself up," or words to that effect. Mr. Iverson responded, "no, it's not like that."

Agent Keith did not ask any direct questions of Mr. Iverson and did not steer the conversation in any way toward the substance of the investigation. Agent Boone returned after two to three minutes and resumed questioning Mr. Iverson. Agent Keith had no further conversation with Mr. Iverson. Agent

---

[2] Agent Boone could not pinpoint when, or if, he returned Mr. Iverson's ID card to him, although he testified he had the ID card at the end of the encounter. Agent Keith clearly recalled that Agent Boone was still in possession of the ID card when he asked Agent Keith to watch over Mr. Iverson while Boone made his phone call at his vehicle. Therefore, the court makes an explicit finding that Agent Boone never returned Mr. Iverson's ID card to him during the entire encounter.

Boone arrested Mr. Iverson shortly after he returned from making his phone call at the vehicle.  Agent Boone at this point read Mr. Iverson his <u>Miranda</u>[3] warnings.  The indictment in this case was subsequently filed.

Mr. Iverson originally moved to suppress all the pre-<u>Miranda</u> statements made to Agents Boone and Keith on April 11, 2015.  After receiving evidence at the evidentiary hearing, Mr. Iverson modified his motion to suppress as to his statements:  he now seeks to suppress only those statements made after Agent Boone announced the real subject of law enforcement's interest in Mr. Iverson.  The government resists Mr. Iverson's motion as modified.

Mr. Iverson also originally moved to suppress the search of his cell phone on the same day, believing that search to have been conducted without a search warrant.  After Mr. Iverson filed his suppression motion, the government provided him with a copy of the state court search warrant for the cell phone.  <u>See</u> Docket No. 24.  Thereafter, Mr. Iverson withdrew his argument that the search of his cell phone was illegal because it was warrantless.

**DISCUSSION**

**A.    Whether Mr. Iverson's Statements Were Taken in Violation of <u>Miranda</u>**

The holding of the <u>Miranda</u> case "is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning."  <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir. 1990) (citing <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966)).  A <u>Miranda</u> warning is

---

[3] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

required prior to questioning whenever two conditions are present:  (1) the suspect is being interrogated and (2) the suspect is in custody.  Unites States v. Flores-Sandoval, 474 F.3d 1142, 1146 (8th Cir. 2007); Griffin, 922 F.2d at 1347; United States v. Carter, 884 F.2d 368, 371 (8th Cir. 1989).  Interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a suspect.  See Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

The statements made by Mr. Iverson on April 11, 2015 can be divided into four groups:  (a) the period prior to when he was told the real reason Agent Boone wanted to talk to him; (b) the period after he was told the reason for Agent Boone's interest in him and before he was handcuffed; (c) the period after he was handcuffed but before Miranda warnings were given; and (d) the post-Miranda interview.  The parties agree that the statements made during periods (a) and (d) should not be suppressed; in the former, Mr. Iverson's encounter with law enforcement was voluntary and he was not yet in custody while in the latter, he was in custody but was given appropriate Miranda warnings.

The dispute, then, centers on periods (b) and (c).  As to period (b), Mr. Iverson argues for suppression on the basis that no reasonable person in Mr. Iverson's position would have felt free to leave.  The government argues that these statements should not be suppressed as Mr. Iverson was not in custody or its equivalent at that point.

The government concedes that during period (c) when Mr. Iverson was handcuffed but not yet Mirandized, his statements made in response to Agent

Boone's interrogation were custodial and should be suppressed. But the government argues that Mr. Iverson's statement to Agent Keith during this period should not be suppressed. Mr. Iverson argues that *all* statements made during period (c), whether made to Agent Boone or Agent Keith, should be suppressed. Therefore, only the statement to Agent Keith during period (c) is contested.

### 1. Pre-Handcuffed Period—Was Mr. Iverson in Custody?

As to the pre-handcuffed period after Agent Boone announced his real interest in Mr. Iverson, neither party disputes that Mr. Iverson was being interrogated and neither party disputes that <u>Miranda</u> warnings were not given prior to the questioning in this time frame. Thus, whether Mr. Iverson's statements during this period should be suppressed pursuant to the rule in the <u>Miranda</u> case depends on whether Mr. Iverson was in custody at this time.

Some courts have placed the burden of proving that the defendant was not in custody at the time of the interrogation on the government. <u>See</u> <u>United States v. Charbonneau</u>, 979 F. Supp. 1177 (S.D. Ohio 1997). Other courts have placed the initial burden on the defendant to prove that he was "in custody," with the burden of proof shifting to the government to prove a voluntary waiver only after the defendant has sustained his initial burden. <u>See</u> <u>United States v. Moore</u>, 104 F.3d 377, 391 (D.C. Cir. 1997). The Eighth Circuit appears not to have addressed this issue yet, although some district courts within the circuit have. <u>See e.g.</u> <u>United States v. Morriss</u>, 2006 WL 3519344 (W.D. Mo. 2006) (placing initial burden on defendant and citing to extra-circuit

cases for authority).  For purposes of this report and recommendation, the court has placed the burden of proving that Mr. Iverson was *not* in custody on the government.

A suspect is considered to be "in custody" either upon his or her formal arrest or "under any other circumstances where the suspect is deprived of his" or her "freedom of action in any significant way."  Griffin, 922 F.2d at 1347 (citing Berkemer v. McCarty, 468 U.S. 420, 429 (1984)).  Absent formal arrest, a suspect is deemed is be "in custody" where a reasonable person in the suspect's position would have believed that his freedom of action had been curtailed to a "degree associated with formal arrest."  Berkemer, 468 U.S. at 442; United States v. Black Bear, 422 F.3d 658, 661 (8th Cir. 2005); Griffin, 922 F.2d at 1347; Carter, 884 F.2d at 370.  The test is one of objective reasonableness judged from the point of view of the suspect, not from the point of view of the interrogator.  Berkemer, 468 U.S. at 442; Black Bear, 422 F.3d at 661; Griffin, 922 F.2d at 1347; Carter, 884 F.2d at 370.  In determining whether a suspect reasonably believed himself or herself to be in custody, the court examines the totality of the circumstances.  Carter, 884 F.2d at 370 (citing United States v. Lanier, 838 F.2d 281, 285 (8th Cir. 1988) (per curiam)).

Under the totality of the circumstances test, six nonexclusive factors have emerged with some frequency:  (1) whether the suspect was informed that he was free to leave and that answering the interrogator's questions was voluntary; (2) whether the suspect possessed freedom of movement during the interrogation; (3) whether the suspect initiated contact with the interrogator or

voluntarily acquiesced in the interrogation; (4) whether the interrogator employed strong-arm tactics or strategies; (5) whether the atmosphere of the interrogation was dominated by the police; and (6) whether the suspect was arrested at the close of the interrogation. See United States v. Flores-Sandoval, 474 F.3d 1142, 1146-1147 (8th Cir. 2007) (citing Griffin, 922 F.2d at 1349). Reference to these factors is helpful, but these factors are not exclusive and custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." Flores-Sandoval, 474 F.3d at 1147. In addition, the place where the interrogation took place, the purpose of the interrogation, the length of the interrogation, and other factors are also to be considered. Griffin, 922 F.2d at 1348; Carter, 884 F.2d at 370.

In United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004), the Eighth Circuit cautioned the Griffin factors are by no means exhaustive and should not be applied "ritualistically." The Court emphasized "an express advisement that the suspect is not under arrest and that his participation is voluntary" is the most obvious and effective means of demonstrating he has not been taken into custody. Id. at 826. The Eighth Circuit regards the twin admonitions that the suspect is free to leave and does not have to answer questions to be "weighty in the custody analysis." United States v. Perrin, 659 F.3d 718, 720-21 (8th Cir. 2011). The Griffin factors still appear in Eighth Circuit case law after Czichray, and continue to be cited with approval for determining the custody issue. See id.

Whether a suspect was the focus of an investigation at the time the interrogation takes place is significant if that fact was communicated to the suspect and that fact contributed to the suspect's reasonable conclusion of not being free to go.  Griffin, 922 F.2d at 1348; Carter, 884 F.2d at 370 (citing United States v. Jimenez, 602 F.2d 139, 145 (7th Cir. 1979)).

Here, the court examines the totality of circumstances and finds that during the period after Agent Boone announced his real purpose in contacting Mr. Iverson, no reasonable person would have felt free to leave.  There were three police officers standing within 20 feet of Mr. Iverson, all focused on him.  He had been told that he was a suspect in the internet sex sting investigation.  When he took several steps backward away from Agent Boone, Agent Boone moved in several steps, maintaining a distance that would allow him to exert physical control over Mr. Iverson if the need arose.  Agent Boone did then step in and take physical control over Mr. Iverson by handcuffing him.  Agent Boone obtained Mr. Iverson's identification card early on in the encounter and did not return it to him.  Finally, and most importantly, Agent Boone never uttered the most important and weightiest of advisements in the custody rubric:  you are not under arrest, you are free to leave, and you do not have to talk to me.  These factors, coupled with Mr. Iverson's relative youth and Agents Boone and Keith's positions of authority and greater age,[4] together form a totality of

---

[4] Mr. Iverson appears to be in his early to mid-twenties.  Both Agent Boone and Agent Keith are clearly middle-aged.  The superior position of authority of both agents derives from their status as law enforcement officers.

circumstances where a reasonable person would not feel free to leave the scene.

The Supreme Court in the <u>Berkemer</u> case addressed the issue of whether a motorist who is the subject of a traffic stop is "in custody" for purposes of <u>Miranda</u>. After the motorist is formally arrested on a traffic violation, no matter how minor, the Court held that <u>Miranda</u> warnings are required. <u>Berkemer</u>, 468 U.S. at 434-435.

However, during the traffic stop itself and prior to arrest, the Court held that <u>Miranda</u> did not apply. <u>Id.</u> at 440-441. The Court acknowledged that a traffic stop "significantly curtails the 'freedom of action' of the driver and the passengers" in the detained vehicle, noting that drivers who see a policeman's signal neither feel free to ignore that signal nor to drive away, once stopped. <u>Id.</u> at 436. However, a traffic stop is generally devoid of those elements of coercion that prompted the announcement of the rule in <u>Miranda</u>. <u>Id.</u> at 436-438. For example, the detention is presumptively temporary and brief, with the driver being allowed to continue on his way after a check of his license and registration and, perhaps, the issuance of a citation. <u>Id.</u> at 437. Also, the interrogation takes place in public, subject to observation by pedestrians and other vehicles, thus reducing the ability of an unscrupulous policeman to "use illegitimate means to elicit self-incriminating statements and diminish[ing] the motorist's fear that, if he does not cooperate, he will be subjected to abuse." <u>Id.</u> at 438. Thus, the Court concluded that the "noncoercive aspect of ordinary

traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for purposes of Miranda." Id. at 440.

The government argues that Mr. Iverson's situation here is akin to the facts of Berkemer and should be controlled by its holding. There are similarities: both situations occurred in public at a roadside. However, traffic stops are commonplace. It would be a rare American who has not been stopped him- or herself, or been a passenger in a vehicle whose driver was pulled over for a traffic stop. We know the drill: produce your driver's license, registration, and proof of insurance, answer a few questions, and you are released and back on your way with a citation or an admonition from the officer.

The type of stop that occurred here while Mr. Iverson was walking down the sidewalk presumably on his way to his house is atypical. It is the rare American in a suburban setting who has experienced such a stop. The rules are unclear. How long will I be detained? Am I under arrest? Can I walk away from these three officers who are eyeing me? If I do, will they pursue me? Agent Boone's failure to clearly tell Mr. Iverson that he was not under arrest, was free to go, and was free to decline to talk to him are facts which, in conjunction with all the other facts of this encounter, tip the balance in favor of a finding that Mr. Iverson was in custody. Accordingly, Miranda warnings should have been given and were not. This court recommends that

Mr. Iverson's motion be granted in part and that his statements made during period (b) be suppressed.[5]

### 2. Pre-Miranda Statements in Agent Keith's Presence—Was Mr. Iverson Interrogated?

As to statements Mr. Iverson made after he was handcuffed, the only statement over which the parties disagree is the statement Mr. Iverson made to Agent Keith to the effect that he was engaging in the online chat in an effort to root out bad guys and expose them to law enforcement. Both parties agree Mr. Iverson was in custody at this time (Agent Boone had handcuffed him), and that no Miranda warnings had been given yet, so the only issue is whether Mr. Iverson was being interrogated.

Interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a suspect. See Rhode Island v. Innis, 446 U.S. 291, 301 (1980); ; see also United States v. Head, 407 F.3d 925, 925 (8th Cir. 2005) ("Interrogation includes not only express questioning by law enforcement officers, but also words or actions that officers should know are reasonably likely to elicit an incriminating response from a suspect."). The "words or actions" of the police must be outside the scope of words and actions that normally accompany the arrest and taking into custody of a defendant. United States v. Wipf, 397 F.3d 677, 685 (8th Cir. 2005) (citing

---

[5] The court notes that Mr. Iverson does not claim that his statements were involuntary. Therefore, although the statements from period (b) are not admissible in the government's case in chief at trial, they would be admissible for impeachment on cross-examination if Mr. Iverson testifies at trial. Oregon v. Elstad, 470 U.S. 298, 307-08 (1985).

Innis, 446 U.S. at 301).  "A statement made by a suspect that is voluntary and not in response to interrogation is admissible with or without the giving of Miranda warnings."  Head, 407 F.3d at 925.

"Miranda does not bar the government from introducing into evidence spontaneous statements made during a conversation not initiated by the officer."  United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005).  In addition, polite conversation between the police and a defendant that is not steered "toward potentially incriminating topics" "is not the functional equivalent of interrogation."  United States v. Tail, 459 F.3d 854, 858 (8th Cir. 2006); see also United States v. Fleck, 413 F.3d 883, 893 (8th Cir. 2005).

In Louisell v. Director of Iowa Dept of Corrections, 178 F.3d 1019, 1023-1024 (8th Cir. 1999), a juvenile was arrested and taken to the police station. Id.  Once there, police called the juvenile's grandmother and legal guardian to request permission to interrogate the juvenile.  Id.  The grandmother granted the police her permission, and then asked to speak with the juvenile.  Id.  The juvenile was allowed to speak on the phone to her grandmother, during which conversation she made incriminating remarks within earshot of the police.  Id. The juvenile moved to suppress these statements, arguing that her statements should be suppressed pursuant to Miranda because handing the phone to the juvenile in the presence of police was the "functional equivalent" of interrogation.  Id.  The Eighth Circuit rejected this argument, noting that the officers did not call the grandmother in an attempt to elicit statements from the

juvenile and that the police did not subject the juvenile to "compelling influences, psychological ploys, or direct questioning." Id.

In United States v. Hunt, 372 F.3d 1010, 1012-13 (8th Cir. 2004), officers identified themselves to the defendant and asked the defendant if he would be willing to cooperate with law enforcement. Id. The defendant then offered the police money as a bribe. Id. The defendant argued that his bribe offer should be suppressed pursuant to Miranda as the product of custodial interrogation. Id. The Eighth Circuit refused, noting that the defendant's bribe offer "was not made in response to any question the [police] asked." Id.

In United States v. Cordova, 990 F.2d 1035, 1036-38 (8th Cir. 1993), police obtained a search warrant for, *inter alia*, Mr. and Mrs. Cordova's residence. Id. When they arrived to execute the search warrant, the officers arrested Mr. Cordova and asked him whether there were drugs in the house. Id. He told the officers he had a "personal stash" of heroin in the bedroom. Id. The officers retrieved the heroin from the bedroom and then approached Mrs. Cordova, who was sitting in the living room. Id. They asked her if her husband had any additional heroin anywhere in the house. Id. Mrs. Cordova subsequently informed officers that she had drugs hidden inside her vagina. Id. Later, she moved to suppress her statements pursuant to Miranda. Id. The Eighth Circuit refused to suppress, noting that the officer had asked her about additional drugs related to *her husband*, not Mrs. Cordova. Id. The fact that Mrs. Cordova then identified drugs which *she herself* possessed was characterized by the court as a voluntary statement, not a response to

17

interrogation likely to produce an incriminating response as to her.  Id.  In such a case, where the statement itself was uncoerced, the court held Miranda has no application.  Id.

In the case of United States v. Swift, 623 F.3d 618, 622-23 (8th Cir. 2010), the Eighth Circuit held that placing two defendants alone in a room together and recording their conversation without telling the defendants that they were being recorded was not "interrogation" within the meaning of Miranda. (citing United States v. Hernandez-Mendoza, 600 F.3d 971, 977 (8th Cir. 2010) (two defendants placed alone together in a police car with recording device activated)).

Here, the government argues Agent Keith was not interrogating Mr. Iverson, he had merely been making small talk with Mr. Iverson about a pick-up truck.  Mr. Iverson does not deny this, but points out that Agent Boone had been interrogating Mr. Iverson right before the statement to Agent Keith and resumed interrogating him after the statement to Agent Keith. Furthermore, Mr. Iverson points out that Agent Boone remained in the area just a few feet from Mr. Iverson when he made the statement to Agent Keith. Thus, argues Mr. Iverson, the statement to Agent Keith was not a separate interaction with police but part and parcel of a continuing sequence of interrogation.

In the Tail case, the Eighth Circuit held no interrogation took place where a police officer engaged in polite conversation with a defendant, but did not ask express questions, did not steer the conversation toward any

incriminating subjects, and kept his answers to Tail's questions short. <u>Tail</u>, 459 F.3d at 857-58. Likewise in <u>Fleck</u>, where an officer engaged in small talk with a defendant about food at the jail, the court found the defendant's incriminating statement was not the product of interrogation. <u>Fleck</u>, 413 F.3d at 893. Finally, in <u>Swift</u> and <u>Hernandez-Mendoza</u>, defendants made incriminating statements after a period of interrogation, but at the time the statements were made, no interrogation was taking place. <u>Swift</u>, 623 F.3d at 622-23; <u>Hernandez-Mendoza</u>, 600 F.3d at 974-75. The court held in both cases that the statements were admissible because no interrogation was taking place. <u>Swift</u>, 623 F.3d at 622-23; <u>Hernandez-Mendoza</u>, 600 F.3d at 974-75.

Here, the court reaches the same conclusion. Although Agent Boone may have interrogated Mr. Iverson before and after his statement was made to Agent Keith, there is no evidence that Agent Boone and Agent Keith choreographed their actions to produce an incriminating statement. Agent Keith was making small talk, not discussing anything remotely connected to the sex sting investigation. Agent Keith had likewise not been part of the earlier interrogation, nor did he join in the later interrogation. Mr. Iverson volunteered his statement; it was not made in response to any question, word, or action on Keith's part. Agent Keith's interaction with Mr. Iverson was not part and parcel of Agent Boone's interrogation. The court therefore recommends that Mr. Iverson's statement to Agent Keith not be suppressed.

**CONCLUSION**

Based on the foregoing facts, law and analysis, this court respectfully recommends that Mr. Iverson's motion to suppress [Docket No. 20] be granted in part and denied in part as follows:

1.     Mr. Iverson's motion to suppress statements made to Agent Boone before Agent Boone told Mr. Iverson the real purpose of his investigation be denied;

2.     Mr. Iverson's motion to suppress statements made to Agent Boone after Agent Boone told Mr. Iverson the real purpose of his investigation but before Mr. Iverson was handcuffed be granted;

3.     Mr. Iverson's motion to suppress statements he made after he was handcuffed and before he was given <u>Miranda</u> warnings be granted with the exception of the statement Mr. Iverson made to Agent Dave Keith, which statement is admissible; and

4.     Mr. Iverson's motion to suppress the fruits of the search of his cell phone as a warrantless search is denied as moot, without prejudicing Mr. Iverson's ability to raise other issues regarding the legality of the search of his cell phone.

**NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.

Objections must be timely and specific in order to require de novo review by the District Court.  <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black</u>, 781 F.2d 665 (8th Cir. 1986).

DATED July 28, 2015.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge